## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA (Pensacola)

| | |
|---|---|
| **RUSSELL K. SHARBAUGH,** *as the* | : No. 3:16-CV-126 |
| ***Personal Representative of the*** | : (Filed: March 24, 2016) |
| **ESTATE OF RICKY DEAN MARTIN,** | : |
| **Plaintiff,** | : Chief Judge M. Casey Rogers |
| | : Magistrate Judge Elizabeth M. Timothy |
| **v.** | : |
| | : CIVIL ACTION – LAW |
| **JOHN C. BEAUDRY,** | : |
| **JACOB R. DENMON,** | : |
| **RICKY J. DUFRENE,** | : |
| **FREDDY L. JOHNSON,** | : JURY TRIAL DEMANDED |
| **JEFFREY M. SMITH,** | : |
| **JEFFERY T. BEASLEY,** | : |
| **KENNETH S. TUCKER, and** | : |
| **RICHARD L. SCOTT,** | : |
| **Defendants.** | : |

## AMENDED COMPLAINT

**AND NOW** comes the Plaintiff, Russell K. Sharbaugh, as the Personal Representative of the Estate of Ricky Dean Martin, by and through his undersigned counsel, and the law firm of Jacob Litigation, A National Civil Rights Law Firm, and avers as follows:

### Jurisdiction and Venue

1.     This action is brought pursuant to 42 U.S.C. § 1983.

2.     Jurisdiction is founded upon 28 U.S.C. § § 1331 & 1343.

1

3.      Venue is proper in this Court, as all Defendants are located within the Northern District of Florida, and the cause of action arose in the Northern District of Florida.

## Parties

4.      Plaintiff, Russell K. Sharbaugh, is the Personal Representative of the Estate of Ricky Dean Martin, ("Estate").  Mr. Sharbaugh is an adult, who, currently resides in Naples, Florida.

5.      Defendant, John C. Beaudry, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer.  All of Defendant Beaudry's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

6.      Defendant, Jacob R. Denmon, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer.  All of Defendant Denmon's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

7.      Defendant, Ricky J. Dufrene, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer, with the rank of Sergeant.  All of Defendant Dufrene's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

2

8.     Defendant, Freddy L. Johnson, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer, with the rank of Lieutenant.  All of Defendant Johnson's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

9.     Defendant, Jeffrey M. Smith, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer, with the rank of Captain.  All of Defendant Smith's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

10.     Defendant, Jeffery T. Beasley, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, with the rank of Inspector General.  All of Defendant Beasley's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

11.     Defendant, Kenneth S. Tucker, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, with the rank of Secretary of Corrections.  All of Defendant Tucker's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

12.     Defendant, Richard L. Scott, is an adult individual, who, during all relevant times, was employed by the State of Florida, in the capacity of Governor.

All of Defendant Scott's actions or inactions were taken under color of state law. He is sued in his individual capacity.

**Factual Background**

**A. <u>Appointment of Personal Representative of Probate Estate and Issuance of Letters of Administration</u>**

13.     On April 8, 2012, Ricky Dean Martin, a resident of Collier County, Florida, died, owning assets in the State of Florida.

14.     On February 11, 2015, the Circuit Court for the Twentieth Judicial Circuit in and for Collier County, Florida, appointed Russell K. Sharbaugh, Personal Representative, of Mr. Martin's probate estate.

15.     On the same date, the Probate Division issued Letters of Administration to Mr. Sharbaugh (Letters, **Exhibit 1**).

**B. <u>No Accountability</u>**

16.     During the relevant period of time, Defendant Scott was the Governor of Florida, Defendant Tucker was the Secretary of Corrections, and Defendant Beasley, was the Inspector General.

17.     Defendants Scott, Tucker, and Beasley, participated in setting policy for the Florida Department of Corrections.

18.    Under the supervision of Defendants Scott and Tucker, the Department of Corrections had a policy of not reporting inmate deaths to the Florida Department of Law Enforcement, or sabotaging the FDLE's investigations.

19.    Defendants Scott, Tucker, and Beasley helped to create, and/or knowingly instituted or permitted policies, practices, and procedures that, according to the Bureau of Prisons, resulted, in 2012, in Florida having a higher prison death rate (325 per 100,000 inmates) than any of the other 10 largest states.

20.    In an effort to keep campaign promises, Defendant Scott cut funding for the Department of Corrections; despite knowing that doing so was resulting in dangerous living conditions where the use of force by corrections officers was increasing, violations of civil rights were occurring, and inmates were dying.

21.    In 2013, when an investigator began to expose widespread abuses committed by guards, Defendant Scott and the Department of Corrections placed the investigator on leave, and then transferred him to a new government job with a promise of a promotion.

22.    As the Inspector General, Defendant Beasley is the policymaker for the Office of Inspector General, who has final decision-making authority within the Office regarding how criminal and internal affairs investigations are conducted, and participates in the overall policymaking of the Department of Corrections.

23.     Defendant Beasley is personally responsible for rooting out department corruption.

24.     Despite this responsibility, Defendant Beasley failed to investigate allegations of officers' wrongdoing and directed investigators under his supervision to back off criminal probes of wrongdoing within the Department.

25.     When confronted by investigators about evidence that corrections officers had lied and filed false reports, and that some inspectors had sabotaged a 2010 Florida Department of Law Enforcement death investigation, Beasley complained that inspectors spent too much time with FDLE who turned every investigation into a "longevity project."

26.     When investigators filed a lawsuit and testified under oath before the Senate Criminal Justice Committee about Defendant Beasley's conduct, it is believed that discovery will reveal that Defendants Scott, Tucker, and Beasley participated in retaliating against the investigators by causing them to be subjected to false internal investigations and transferred out of the IG's office.

27.     Defendants Scott's, Tucker's, and Beasley's conduct created an environment within the Florida Department of Corrections, generally, and within the Santa Rosa Correctional Institution, specifically, wherein corrections officers knew that they could engage in criminal conduct that violated prisoners' civil rights, with impunity.

6

28.     Defendants Scott's, Tucker's, and Beasley's conduct in creating an environment where corrections officers felt safe from administrative or criminal accountability directly caused or permitted Defendants Beaudry and Denmon to engage in their conduct described herein.

29.     In 2010, it was reported that inmate Randall Jordan-Aparo died at the Franklin Correctional Institution of natural causes as a result of a lung condition.

30.     In 2013, however, two inspectors discovered that corrections officers had repeatedly used chemical agents on him and then filed false reports.

31.     It was further discovered that DOC inspectors withheld from FDLE and the medical examiner a video that established that the inmate was merely begging for medical assistance when he was sprayed repeatedly with chemical agents.

32.     When they informed Defendant Beasley of their findings, he did nothing.

33.     Defendant Beasley reportedly instructed subordinates to stick to the "low-lying fruit" – meaning, to only punish the low level culprits and then move on; evidencing the culture and behavior permitted by Defendant Scott.

34.     The Inspectors reported that Defendant Beasley told them to back off the Jordan-Aparo investigation or they would regret it.

35.     In June of 2012, inmate Darren Rainey, who was incarcerated at the Dade Correctional Institution's Transitional Care Unit, died after being locked in a

7

closet-like scalding hot shower, which had the shower controls located outside of the shower.

36.    The Inspector General suspended the investigation despite numerous reports that the shower had been created to torture mentally ill inmates.

37.    In August of 2013, inmate Richard Mair, who was incarcerated at the Dade Correctional Institution, complained that officers in the mental health unit were physically and sexually assaulting inmates, and that he had been threatened.

38.    The Inspector General closed the case within one month – deciding the claims were unfounded.

39.    One month later, Mair was found hanging in his cell, dead.

40.    In September of 2013, inmate Jerry Washington, who was incarcerated at the Santa Rosa Correctional Institution, was found dead of an apparent poisoning/suicide, shortly after filing a sexual harassment complaint against a corrections officer and reporting that an officer threatened to kill him.

41.    On May 21, 2014, Damion Foster, who had been inmate Richard Mair's neighbor when Mair died and who had filed grievances alleging similar conduct while he had been incarcerated at Dade Correctional Institution, was killed during a cell extraction at the Martin Correctional Institution.

42.     In October of 2014, 10 days after reporting that a corrections officer threatened to beat and kill her, 36 year old inmate Latandra Ellington was found dead as a result of blunt force trauma.

43.     The DOC, under the ultimate supervision of Defendant Scott, continues to attempt to cover up information regarding inmate deaths, and continues to delay or prevent investigations into inmate deaths.

44.     In this regard, in 2015, only two days after the Florida Legislature's Criminal Justice Committee grilled Defendant Beasley about inmate death investigations and reported DOC corruption, the DOC issued a new policy providing that all investigators working in the Inspector General's Office must sign a confidentiality agreement precluding them from speaking to anyone about any open or closed investigation.

45.     Defendants Scott, Tucker, and Beasley did not merely disregard veiled threats or speculative harm.

46.     Rather, Defendants Scott, Tucker, and Beasley knew that the conduct that they engaged in was directly causing inmates to be seriously injured or killed but ignored the risk while the body count continued to rise.

C. <u>**Santa Rosa Correctional Institution**</u>

47.     The Florida Department of Corrections (hereinafter "Department" or "DOC") is the third largest state prison system in the country, with a current budget

of $2.1 billion, consisting of 142 facilities housing over 100,000 inmates, and 115,000 offenders on active community supervision.

48. Inmate housing decisions are supposed to be made by the Department's security and classification officers.

49. However, it is believed that discovery will reveal that during the relevant period of time, all Defendants knew that the Department did not have an inmate classification policy that identified predator or non-predator inmates.

50. The most serious offenders, with the longest sentences, and those least likely to adjust to institutional life, are placed in the more secure facilities.

51. Correctional institutions are divided into seven levels of security, ranging from minimum custody facilities to maximum custody facilities.

52. During the relevant period of time, the Santa Rosa Correctional Institution was a level six facility, and was a close-management housing facility.

53. Close management is disciplinary custody, not protective custody, where an inmate is housed separate from the general inmate population.

54. This status is designed to house inmates who commit acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others.

55.     Close management is very restrictive housing, where inmates are confined to their cells up to 24 hours a day.

56.     There are three levels of close management: I, II, and III, with I being the most restrictive, and III being the least restrictive.

57.     Close management is the most restrictive level of housing below death row and max management.

58.     The D dormitory of the Santa Rosa Correctional Institution is an older building that is shaped like the letter T.

59.     The central part of the T is where the officers' station, security offices, break room, and lieutenants' offices are located.

60.     The inmates reside in the three wings that branch out from the center of the T.

61.     If one were to enter D1 from the control area in the T, the first cell on the left would be D1-101, and the first cell on the right would be D1-122.

62.     Cells 101-112 are on the left, and cells 113-122 are on the right.

**D. <u>The Duties of a Correctional Officer</u>**

63.     Florida corrections officers are responsible for the supervision, care, custody, and control of all inmates in Florida correctional institutions and facilities.

64.     Correctional officers' duties and responsibilities include, but are not limited to, supervising inmates in housing units and those segregated for

11

administrative or punitive measures, maintaining a periodic patrol either inside or outside the institution to ensure the security and integrity of the institution, maintaining control and discipline, initiating and participating in search of inmate recreation areas, work areas, and housing units to prevent the introduction of contraband items, and preventing the introduction of contraband into the institution.

65.     On March 30, 2012, Defendant Corrections Officers Beaudry and Denmon, and Corrections Officers Dean Givens, Michael Brady, David Osborne, and Andrew Whitehead, were assigned as Close Management Housing Officers, in Dormitory D, at the Santa Rosa Correctional Institution.

66.     On the same date, Defendant Dufrene was assigned as Close Management Housing Sergeant, in Dormitory D, at the Santa Rosa Correctional Institution.

67.     On the same date, Defendant Johnson was assigned as the Third Shift Assistant Supervisor, in Dormitory D, at the Santa Rosa Correctional Institution.

68.     On the same date, Defendant Smith was assigned as the Third Shift Supervisor, in Dormitory D, at the Santa Rosa Correctional Institution.

**E. Shawn Rogers**

69.     Shawn Rogers, is a 6 foot 4 inch, 210-260 pound, black male inmate, who, during the relevant period of time, was known to have gang ties, and a long history of physically attacking and beating other inmates.

70.     During the relevant period of time, Rogers was serving a life sentence for armed robbery and aggravated battery.

71.     In July of 2012, the Inspector General Office Log System *(IGLOOS)* for Rogers revealed that from 2002 through 2012, Rogers had 28 disciplinary incidents, and was the suspect in four assault and battery cases.

72.     In case #02-2-3542, at Baker Correctional Institution, Rogers tied his cellmate's hands and feet together, and placed a pillowcase over his head.

73.     In case #05-1-0531, at Santa Rosa Correctional Institution, Rogers was found standing over an inmate, who was lying face down on the floor and bleeding.

74.     The inmate's hands were tied behind his back, and his legs and feet were bound with sheet material.

75.     Rogers admitted beating the inmate.

76.     Rogers was transferred to Florida State Prison, which houses inmates who have been sentenced to death row.

77.     In case # 09-2-4996, at Florida State Prison, Rogers stabbed another inmate in the head and face, while waiting in the mental health outpatient room.

78.     In case# 09-2-6039, at Union Correctional Institution, Rogers was observed kneeing another inmate in the face, while that inmate was sitting on a bench.

79.     In 2011, Rogers was transferred back to the Florida State Prison, where it is reported that he physically assaulted three more inmates.

80.     Roger's disciplinary violations include violent assaults on inmates, exposing himself to inmates and staff, threatening inmates and staff, and fighting.

81.     Rogers often threatened prison officials, and advised prison officials on more than one occasion that he had two life sentences, and that as a result, they could not do anything to him.

82.     On March 14, 2012, Rogers was transferred back to the Santa Rosa Correctional Institution.

83.     Rogers was placed in a cell, in Dormitory D, believed to be in close management supervision level II.

84.     Rogers was transferred to cell D1-117, Martin's cell, and assigned to the top bunk.

**F.  Ricky Dean Martin**

85.     Ricky Dean Martin was a 5 foot 10 inch, 135-140 pound, white male, with blond hair and blue eyes.

86.     Martin was serving a six-year sentence for grand theft and armed burglary with a tentative release date in October of 2013.

87.     Martin's armed burglary arrest resulted from allegedly breaking into an unoccupied house, stealing guns, and selling them for $600.

14

88.     Martin's burglary was classified as an "*armed* burglary," because in Florida, stealing a weapon during a burglary is considered armed burglary.

89.     In November of 2011, while housed at the Northwest Florida Reception Center, Martin filed a grievance, asking the inspector general to place him in protective custody because his life was being threatened.

90.     Martin explained in his grievance that he had been labeled a "snitch," because he had reported to prison officials that guards at the reception center had been running a "fight club."

91.     Martin further explained that specifically identified corrections officers "told me that I was a snitch and told inmates about the incident; now I have inmates and officers after me."

92.     Martin also claimed that one of the officers had set him up by planting a knife in his cell.

93.     The inspector general denied Martin's request for protection.

94.     On March 27, 2012, in accordance with the policies, practices, and customs created and/or implemented by Defendants Scott, Tucker, and Beasley, and in retaliation for his complaints against corrections personnel, Martin was transferred to the Santa Rosa Correctional Institution, a maximum security prison.

95.     Considering Martin's criminal history, prison disciplinary history, and standards in the prison industry, Martin's housing classification was inappropriately high.

96.     Martin was placed in Dormitory D, believed to be in close management supervision level II, in cell D1-117, with Rogers, and assigned to the bottom bunk.

## G. Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, Knew that Martin was in Grave Danger but Left Him in the Cell with Rogers to Die

97.     Defendants Dufrene, Johnson, and Smith, supervised Defendants Beaudry and Denmon, and were responsible for ensuring Martin's physical safety.

98.     Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, knew that Defendants Tucker, Scott, and Beasley, failed to adopt or implement an inmate classification policy or procedure that identified inmates as predator or non-predator.

99.     Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, knew that they were not permitted to follow unlawful orders or directions.

100.     Moreover, Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, knew that they were responsible to ensure Martin's safety, since Martin was in their custody.

101.     Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, approved and/or permitted Martin and Rogers to be placed in, or to remain in, the same cell.

102.   Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, were not permitted to be deliberately indifferent to Martin's safety by arbitrarily assigning, or leaving Martin in a cell with Rogers.

103.   Rather, at the very least, Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, were required to use common sense, and to consider the inmates' age, size, strength, disciplinary history, criminal history, known biases or conflicts, and propensity for violence, before placing inmates in, or leaving inmates in, a cell together.

104.   This is especially true, since Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, were on notice that being a Close Management facility, they were generally only encountering inmates who commit acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others.

105.   Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, however, did not do so.

106.   Moreover, if Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, could not do so, it would be deliberately indifferent for them to just place Martin and Rogers is a cell together and just hope for the best.

107.   Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, could have kept Martin and Rogers separated but did not do so.

108.   Defendants Dufrene, Johnson, and/or Smith, despite having access to video monitoring, audio monitoring, written reports, and the inmates, failed to utilize their authority and access to properly supervise Defendants Beaudry and Denmon or to ensure Martin's safety.

109.   Following Martin's murder, Florida Department of Corrections spokesman Lewis admitted that under the supervision of Defendants Scott and Tucker, the Department of Corrections did not have a system in place to identify inmates as predator or non-predator.

110.   The Department of Corrections admitted that "database reports do not replace the sound correctional judgment of staff. There should be some additional consideration before placing a 6'04" 260 lb. inmate with a life sentence in a cell with a 5'4" 140 lb. inmate with a release date 12 months away."

111.   During a hearing in 2015, Beasley defended not disciplining the officers who placed Rogers in the cell with Martin, stating, "there was no policy and procedure violation at the time."

**H. Shawn Rogers Rapes and Beats Martin**

112.   Two days before Rogers beat Martin to death, there had been a racially related disturbance in the prison; thereby placing Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, on notice of the increased possibility of racial violence occurring in the institution.

113.   On March 30, 2012, Rogers and other black inmates were particularly agitated because news of the Trayvon Martin incident had reached the prison population, placing Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon, on further notice of the increased possibility of racial violence occurring in the institution.

114.   On the day of the beating, Rogers announced that he wanted to kill a white inmate to avenge racial injustices.

115.   An inmate testified under oath that Rogers tried to get an officer's attention; the officer ignored him.

116.   The inmate testified that Rogers then began yelling that he was killing his cellmate because he had swastikas on him, and that Rogers stated, "I'm going to kill this cracker."

117.   When Defendant Beuadry stopped in front of the cell, inmates reported hearing Rogers tell Beaudry that Martin was trying to kill himself but that Defendant Beaudry responded by stating something to the effect of, "okay," "I don't care," "he'll survive," or "Talk to the next walking officer, I'm too busy now."

118.   One inmate reported that he heard the upstairs officer tell the downstairs officer to let the next officer deal with it.

119.   Inmates testified under oath that they specifically told Defendant Denmon to get Martin out of the cell, and that Rogers told an officer to get Martin out of his cell or he would kill him.

120.   Inmates testified under oath that they warned Defendant Denmon that Rogers intended to rape Martin, but that Defendant Denmon stated something to the effect of, "he did not want anything to do with that," and kept walking.

121.   One inmate testified under oath that he heard Defendant Denmon say that he needed to go downstairs because an inmate was hurt, and that Defendant Denmon stated, "The next officer that comes past will take care of that."

122.   One inmate testified under oath that he heard Rogers tell an officer that Martin was trying to hang himself, and that the officer commented, "Okay, let another officer find him," as the officer continued with the count.

123.   One inmate testified under oath that he heard Rogers tell Defendant Beaudry that Martin was cutting himself.

124.   One inmate testified under oath that before the officer who had stopped to speak with Rogers departed D wing, inmates told the officer that he needed to get the white inmate out of the cell.

125.   In all, 28 separately interviewed inmates told DOC investigators, including Defendant Beasley, that they heard Rogers tell a guard that he needed to get Martin out of his cell because he was trying to kill himself.

20

126.    Some of the inmates further testified that they told Defendants Beaudry and Denmon that Martin was in trouble and needed their help.

127.    All of the inmates testified that the officers ignored the warnings, while commenting that the next shift would handle it.

128.    Inmates testified under oath that Rogers yelled, "Ya'll think I should kill this cracker!" and that inmates began chanting, "Yes, kill him, kill him!"

129.    Inmates testified under oath that they were so disturbed by the high-pitched screams, thuds, and slapping sounds, that inmates shouted for Rogers to "stop," and "put him on the door."[1]

130.    Rogers used strips of cloth to tie Martin's wrists behind his back, and to bind his ankles together.

131.    Rogers punched, kicked, and stomped on Martin's body.

132.    Rogers struck Martin with a makeshift slapjack, which consisted of batteries wrapped in cloth.

133.    Rogers used a razor or makeshift knife to cut Martin.

134.    Inmates testified under oath that an inmate had provided Rogers with "peanut butter squeezes" to use as a lubricant.

135.    Rogers admitted to several inmates that he "stuck a finger in Martin's ass."

---

[1] Putting an inmate on the door," refers to removing an inmate from their cell.

21

136.   In addition, it is believed that Rogers anally raped Martin.

137.   Rogers yelled "The cracker's pussy is good."

138.   When Martin screamed out in pain, Rogers said, "Shut up cracker, shut up."

139.   Rogers announced that he was assaulting Martin for Trayvon and Martin Luther King.

140.   Witnesses reported seeing Rogers climb onto his top bunk and jump on Martin's head at least 10 times.

141.   An inmate reported hearing another inmate tell Rogers to tie something around Martin's neck to make it look like he tried to kill himself.

142.   Rogers announced, "it is over," and that "the only reason Martin is still alive is because of you (referring to inmates who told Rogers not to kill Martin because he would get in worse trouble."

143.   Rogers stated, "God is going to bless you. I'm not going to kill him. Just tell the officers to come get him."

144.   Inmates witnessing the assault banged on their cell doors until corrections officers responded.

145.   Martin was discovered lying in a pool of his own blood, with his arms and legs bound, naked from the waist down, with his pants pulled down around his ankles.

146.   A pair of bloody boxer shorts had been pulled over Martin's head, and another piece of linen was wrapped around Martin's neck.

147.   Rogers beat Martin so badly, that Martin suffered a brain injury, and Martin's face was swollen, bloody, bruised, and not recognizable.

148.   Martin had lacerations all over his body.

149.   After assaulting Martin, Rogers repeatedly stated that it was well known by prison officials that he was capable of doing what he did.

150.   Specifically, Rogers boasted, "It's no military secret that I have been one of the most vicious and violent prisoners in the entire state of Florida."

## I. Prison Officials and Inmate Witnesses Rebut Defendants Beaudry's and Denmon's Story

151.   Defendants Beaudry and Denmon admit that at approximately 7:02 PM, they conducted a security check in Unit 1, of Dormitory D, where cell D1-117 is located.

152.   Defendants Beaudry and Denmon admit that Denmon checked the top tier and Beaudry checked the bottom tier.

153.   A security video establishes that during the relevant period of time, Defendant Beaudry paused outside of cell D1-117, and the shadow of another person can be seen on the tier above.

154.   Defendant Beaudry admits that during the relevant period of time, he spoke to Rogers, who was standing in front of the window in cell D1-117, wearing a pair of boxers.

    A. A corrections officer, however, claims that when he removed Rogers from the cell after the beating, Rogers was wearing a white t-shirt, state-issued blue pants, and shower slides.

    B. Defendant Dufrene admits to seeing blood spots on Roger's pants and shoes.

155.   Defendant Beaudry claims that when he checked on Rogers and Martin, he could see past Rogers and into the cell.

    A. Inmate witnesses, however, report that during the security check, Rogers had covered the cell window with a blue shirt.

    B. Inmate witnesses further report that the officer who spoke with Rogers during the security check did not require him to remove the shirt from the window.

156.   Defendant Beaudry claims that during the security check, he observed Martin lying on his bunk, shirtless, covered by a sheet, and that both Rogers and Martin appeared to be fine.

A. In 28 sworn statements, however, inmates testified that they heard Rogers tell a guard that he needed to get Martin out of his cell, because according to Rogers, Martin was trying to kill himself.

B. Some of the inmates testified that they specifically told Defendants Beaudry and Denmon that Martin was in trouble, and that they needed to help him.

C. Four inmates testified that they pleaded with either Defendants Denmon or Beaudry to rescue Martin because he was being raped and beaten by Rogers.

D. Two inmates testified that they heard two of the four aforementioned inmates tell Defendant Denmon to get Martin out of Rogers' cell.

E. One inmate testified that he heard Rogers tell Defendant Beaudry, "that if he did not get the white boy out of his cell, he was going to fuck him up."

F. One inmate testified that he heard someone tell an officer, "Rogers in cell #D1-117 was killing his cellmate."

G. All 28 inmates testified that the officers ignored their warnings, stating something to the effect of, "let the next shift handle it," before exiting the housing area.

H. The security video indicates that the security check began at 7:02 PM, and ended at 7:03 PM.

157. Defendant Givens admits that at 7:05 PM, he entered Dormitory D to use the bathroom in cell D1-101.

158. Defendant Givens admits that it was not until he exited the bathroom, that he heard a commotion and proceeded to investigate.

159. Defendant Givens admits that he stopped at cell D1-109, and spoke to an inmate about the noise.

160. Defendant Givens admits that he then proceeded to cell D1-117, where he observed Martin on the floor, on his back, with his arms behind his back, covered from his head to his lower abdomen, with what appeared to be a prayer rug.

161. Defendant Givens admits that Martin was wiggling his arms.

162. Defendant Givens admits to seeing blood on the cell walls and on the floor around Martin.

163. Defendant Givens claims that Rogers repeatedly stated that Martin was cutting himself.

164. Defendant Givens claims that at 7:07 PM, when Martin did not comply with his orders to show his arms and to stop harming himself, he summoned his supervisor, Defendant Dufrene, to the cell.

A. Defendant Beaudry admits that at approximately 7:07 PM, Defendant Dufrene directed him to retrieve the non-electric concave Plexiglas shield and report to cell D1-117.

B. Defendant Johnson admits that at approximately 7:08 PM, Defendant Dufrene summoned him to D dormitory for an inmate cutting.

165.    Defendant Givens claims that at 7:10 PM, after Martin continued not to comply with his orders, he administered chemical agents.

A. Defendant Dufrene, however, admits that Defendant Whitehead reported the deployment of chemical agents at 7:07 PM.

166.    Defendant Givens claims that when he deployed the chemical agents, Martin rolled onto his stomach, at which time he observed that Martin's wrists were tied behind his back.

167.    Defendant Givens claims that at 7:11 PM, Defendant Johnson ordered officers to enter the cell.

168.    Upon entering cell D1-117, Defendants Beaudry and Denmon admit that they observed Martin on the floor, on his stomach, with his wrists and ankles bound by white cloth, with what appeared to be a prayer rug draped on his back, and a pair of bloody boxers over his head.

169.   Defendant Beaudry admits that he removed the boxers from Martin's head and observed a white cloth tied around Martin's neck.

170.   Defendant Denmon admits that he saw blood pooling from the right side of Martin's head.

171.   Defendants Beaudry and Denmon admit to observing multiple superficial lacerations on Martin's body.

172.   On March 30, 2012, at 7:45 PM, Martin was transported by ambulance to the hospital.

173.   On April 8, 2012, at 11:38 AM, Martin was pronounced dead.

174.   On April 9, 2012, an autopsy determined that Martin's death was a homicide caused by blunt impact of the head.

## J.  **The Investigation**

175.   On April 4, 2012, the Office of Inspector General received notice of the incident.

176.   An inmate housed in D1-116 (directly next to cell D1-117) testified in a sworn statement that he heard Martin ask Defendant Beaudry, just hours prior to being assaulted, to move him away from Rogers.

177.   The inmate testified that Defendant Beaudry told Martin, "Fight or fuck."

178.   Other inmates reported to investigators that they understood "fight or fuck" to be established prison policy at Santa Rosa Correctional Institute.

179.   Defendant Beaudry did not move Martin away from Rogers.

180.   The inmate's interview discussing the "fight or fuck" policy was conspicuously omitted from the final inspector general's report posted on the Department's website.

181.   It has been reported that the Department interviewed 12 corrections officers and over 75 inmates.

182.   While dozens of inmates provided hours of interviews under oath, only one corrections officer, Defendant Beaudry, provided a sworn interview, which lasted only nine minutes.

183.   While 10 other officers provided written affidavits to affirm the correctness of their written reports, it does not appear that they were ever formally interviewed.

184.   On September 6, 2012, the investigation was "Closed by Indictment," upon the indictment of Rogers for Premeditated Murder and other crimes.

185.   McKinley Lewis, a spokesman for the Department of Corrections, stated that "neither the [Florida Department of Law Enforcement] nor the DOC inspectors assigned identified any violation of Florida law or department procedures."

186.    The scope of the DOC's investigation, however, was limited to whether or not crimes had been committed, not whether or not DOC policies had been violated, as evidenced by the investigation being closed upon the indictment of Rogers.

## COUNT I

**Plaintiff v. Defendants Dufrene, Johnson, Smith, Beaudry, and Denmon Eighth Amendment – Cruel and Unusual Punishment – Failure to Protect (pursuant to 42 U.S.C. § 1983)**

187.    Paragraphs 13-186 are stated herein by reference.

188.    The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

189.    The U.S. Supreme Court, in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), established the current legal standard for federal civil rights liability against correctional officials and employees, in the context of the failure to prevent prisoner on prisoner assault.

190.    While previous court cases had established that it takes "deliberate indifference" to a substantial risk of serious harm to an inmate to violate the Eighth Amendment's prohibition on cruel and unusual punishment, <u>see</u> <u>Helling v. McKinney</u>, 509 U.S. 25 (1993), <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991), and <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), <u>Farmer</u> makes it clear that "deliberate indifference" is based on subjective awareness, i.e., that the prison official knows that an inmate

or inmates face a substantial risk of serious harm, and disregards that risk, by failing to take reasonable measures to abate it, or to prevent it.

191.   Both Martin and Rogers were in the care, custody, and supervision of the Defendants.

192.   While the Courts generally defer to prison officials to determine the classification and placement of prisoners, prison officials are not permitted to violate prisoners' constitutional rights when doing so.

193.   The reckless or intentional subjecting of Martin to physical assault, rape, and death, is a sufficiently serious deprivation within the zone of Eighth Amendment protection.

194.   The Defendants were deliberately indifferent to Martin's health and safety.

195.   The Defendants had actual knowledge of, appreciated, and ignored, the risks and dangers to Martin's health and safety.

196.   Despite having an appreciable opportunity to do so, the Defendants took no action to abate the risk and danger to Martin's health and safety.

197.   Each Defendant observed Rogers and Martin in a cell together, appreciated the danger that Martin was in, but failed to separate Rogers and Martin.

198.   The Defendants either placed, or permitted to remain, a particularly aggressive and violent inmate, with a history of physical assaults, who was serving

a life sentence, Rogers, in a cell with a non-violent inmate, Martin, with less than two years left to serve.

199.   The Defendants either placed, or permitted to remain, a known racist black inmate, Rogers, in a cell with a white inmate, Martin, at a time when racial tension was heightened or at an all-time high in the institution.

200.   The Defendants either placed, or permitted to remain, a predatory homosexual inmate, with a history of sexual assaults, Rogers, in a cell with a physically smaller heterosexual inmate, Martin.

201.   Rogers was 6'04", 260 lb., visibly agitated, and verbalizing his intent to Kill Martin, who was 5'4", 140 lb., with a slight build.

202.   Martin did not instigate or cause the violence that befell him.

203.   The Defendants' actions and inactions were the direct and proximate cause of Martin's death.

204.   As a direct and proximate cause of the Defendants' actions, Martin suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

## <u>COUNT II</u>

**Plaintiff v. Defendants Scott, Tucker, Dufrene, Johnson, and Smith
Eighth Amendment – Supervisory Liability
(pursuant to 42 U.S.C. § 1983)**

205.   Paragraphs 13-186 are stated herein by reference.

206.   The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

207.   A supervisor may be held liable for his/her actions that cause a constitutional injury.

208.   The supervisory Defendants failed to properly train the subordinate Defendants regarding the responsibilities associated with their respective employment positions.

209.   The supervisory Defendants failed to properly supervise the subordinate Defendants to ensure that the subordinate Defendants were properly performing their employment duties.

210.   The supervisory Defendants were responsible for the health and safety of inmates, like Martin, who were in their custody.

211.   The supervisory Defendants may not delegate the constitutional duties that they owed to Martin to subordinate employees.

212.   The supervisory Defendants failed to implement or follow a lawful inmate classification system that identified predator and non-predator inmates, which directly resulted in Rogers and Martin being housed together in a single cell.

213.   The supervisory Defendants placed, or permitted to remain, a particularly aggressive and violent inmate, with a history of physical assaults, Rogers, in a cell with a non-violent inmate, Martin.

214.   The supervisory Defendants placed, or permitted to remain, a known racist black inmate, Rogers, in a cell with a white inmate, Martin, at a time when racial tension was heightened or at an all-time high in the institution.

215.   The supervisory Defendants placed, or permitted to remain, a predatory homosexual inmate, with a history of sexual assaults, Rogers, in a cell with a physically smaller heterosexual inmate, Martin.

216.   Defendants Scott, Tucker, and Beasley had direct knowledge that officers were engaging in unlawful conduct.

217.   Defendants Scott, Tucker, and Beasley, as policymakers and/or by virtue of the authority of their offices, had the opportunity to stop the criminal conduct from occurring but neglected to do so.

218.   Instead, they refused to investigate or retaliated against investigators who investigated criminal wrongdoing.

219.   Importantly, Defendants Scott, Tucker, and Beasley knew that their conduct would cause officers to either act, or continue to act, unlawfully, but failed to stop them from doing so.

220.   As a result, the supervisory Defendants' actions and inactions were the direct cause of Martin's death.

221.   As a direct and proximate cause of the Defendants' actions, Martin suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor as follows:

A.   That this Court issue a declaratory judgment, declaring that the Defendants' actions violated the decedent's constitutional rights;

B.   Compensatory damages including but not limited to the monetary value associated with the following: loss of enjoyment of life, torture, immense pain and suffering, humiliation, terror, and death (hedonic damages);

C.   Punitive damages;

D.   Reasonable attorney's fees and costs;

E.   A jury trial; and,

F.   Such other financial or equitable relief as is reasonable and just.

## Jury Trial Demand

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

**Date: August 11, 2016**

**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
Counsel for Plaintiff

**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA (Pensacola)**

| | |
|---|---|
| **RUSSELL K. SHARBAUGH,** | **: No. 3:16-CV-126** |
| **Plaintiff,** | **:** |
| | **: Chief Judge M. Casey Rodgers** |
| **v.** | **: Magistrate Judge Elizabeth M. Timothy** |
| | **:** |
| **JOHN C. BEAUDRY, et al.,** | **: CIVIL ACTION – LAW** |
| **Defendants.** | **: JURY TRIAL DEMANDED** |

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following person(s):

**JAMES A. TALBERT, ESQUIRE**
Email: atalbert@qpwblaw.com

**WILLIAM B. CARTER, JR, ESQUIRE**
Email: ben@djmf-law.com

**MICHELLE L. HENDRIX, ESQUIRE**
Email: mhendrix@florida-law.com

**WILLIAM P. MARTIN, ESQUIRE**
Email: peter@djmf-law.com

**ELIZABETH N. PALMER, ESQUIRE**
Email: npalmer@wpslawyers.com

**ALBERT BOWDEN, ESQUIRE**
Email: al.bowden@myfloridalegal.com

**LAURA B. FARAGASSO, ESQUIRE**
Email: lbfaragasso@henryblaw.com

**Date:  August 11, 2016**

_____
**DEVON M. JACOB, ESQUIRE**